ANDREW M. ZACKS  (SBN 147794)
JAMES B. KRAUS (SBN 184118)
ZACKS UTRECHT & LEADBETTER, P.C.
235 Montgomery Street, Suite 400
San Francisco, CA  94104
(415) 956-8100

Attorneys for: Plaintiff Regan Carroll Trust

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO

| | |
|---|---|
| REGAN CARROLL TRUST, Regan Carroll, trustee,<br><br>          Plaintiff,<br><br>     v.<br><br>CITY AND COUNTY OF SAN FRANCISCO, SAN FRANCISCO DEPARTMENT OF BUILDING INSPECTION, SAN FRANCISCO BUILDING INSPECTION COMMISSION, SAN FRANCISCO PLANNING DEPARTMENT<br><br>          Defendants. | ACTION NO: C-07-2577 SBA<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Hearing Date:     February 26, 2008<br>Time:               1:00 p.m.<br>Place:              Courtroom 3<br>Judge:<br>     Hon. Sandra Brown Armstrong |

## TABLE OF CONTENTS

I.    INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   FURTHER LEAVE TO AMEND SHOULD BE GRANTED  . . . . . . . . . . .  2

    A.    The Standard Favor Leave To Amend . . . . . . . . . . . . . . . . . . . . . . . . . .  2

    B.    Proposed Amendment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

III.  CARROLL CAN STATE A CLAIM UNDER 42 USC 1983  . . . . . . . . . . . . .  5

    A.    Substantive Due Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

        1.    Targeted Governmental Conduct Can Rise To A Constitutional
            Level  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

        2.    Government Conduct That Deprives Carroll Of A Permit To
            Which He Is Entitled Violates Substantive Due Process . . . . . . 10

    B.    Equal Protection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    C.    Carroll's Claims Are Not Time-Barred  . . . . . . . . . . . . . . . . . . . . . . . 18

    D.    Neither Res Judicata Nor Collateral Estoppel Apply  . . . . . . . . . . . . . 18

    E.    Carroll's Claims Are Not Unripe  . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

IV.   CARROLL SHOULD BE GIVEN LEAVE TO FILE A SUPPLEMENTAL
    COMPLAINT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

V.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

---

I.    **INTRODUCTION**

This case is not about land use decisions made in the ordinary course by a local bureaucracy. It is not about the merits of properly-executed adjudicatory decisions. It is about the arbitrary singling out of a permit applicant for egregious, unfair, and capricious treatment because he would not dance to the tune of a powerful neighborhood association.

As will become clear, in much regard, the parties' arguments do not clash because the City ignores Carroll's central allegation – the permit *was* approved and was ready for his pickup when a member of DNA instructed a rogue City planner to recall (i.e., snatch) it. While this motion is not the City's answer, and the City is not obligated to deny the allegation per se, it is obligated to address its arguments to the allegations and not attempt to convert them into something else – a denial of his permit via the regular and proper adjudicatory process. The City never explains why, if the permit were not originally issued, it was necessary for a DNA member to force the recall. Perhaps Carroll should flesh out his factual position better, which he discusses below, but that is a wholly different proposition. Contrary to the City's argument, Carroll does not consider this Court to be the Grand Mufti of the Planning Department. (MPA at 9:22-23) He is not asking it to review regularly-constituted substantive determinations relevant to his application. He has no reason to, because the Planning Department *approved* it. To the extent the City claims it is constitutional to discriminate against its citizens for standing up to a bully neighborhood association, that is undercut by the United States Supreme Court's decision in <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562 (2000).

II.    FURTHER LEAVE TO AMEND SHOULD BE GRANTED

    A.    The Standard Favor Leave To Amend

        Motions to dismiss for failure to state a claim are disfavored. (Gilligan v. Jamco Dev. Corp., 108 F.3d 246, 249 (9th Cir.1997))  FRCP 12(b)(6) dismissals are proper only in "extraordinary" cases. (United States v. City of Redwood City, 640 F.2d 963, 966 (9th Cir.1981))  In dismissing for failure to state a claim, "a district court should grant leave to amend even if no request to amend the pleadings was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." (Doe v. United States, 58 F.3d 494, 497 (9th Cir.1995))  Rule 15 instructs that "leave shall be freely given when justice so requires."  Courts therefore generally grant leave to amend unless there is a substantial reason to deny it, such as "undue delay, undue prejudice to defendants, [or] futility." (Carruthers v. BSA Advertising, Inc., 357 F.3d 1213, 1218 (11th Cir. 2004); Thomas v. Town of Davie, 847 F.2d 771, 773 (11th Cir. 1988))

        There is no reason to deny leave to amend in this case.  There clearly has been no undue delay, and defendants do not argue that they will be prejudiced by the amendment.  Perhaps Carroll has not sufficiently pled his complaint to date.  However, this is not a run-of-the-mill development dispute, an argument over whether an interpretation was proper, or even whether the Planning Department followed the law.  Instead, it is about the abject abuse of government power to clamp down on a disfavored person whom the local neighborhood governing group hates and wishes to injure.  As even the City's cases show, in such instance, the Constitution does provide protection.  Carroll should be given a final opportunity to

Opposition to Defendant's Motion to Dismiss

1    plead his case with whatever particularity the Court deems necessary under FRCP

2    8(a).[1]  Furthermore, Carroll should not be required to prove up his proposed

3
     amended facts because he has not had the opportunity to take discovery.  "[W]here
4
5    the proof is largely in the hands of the alleged conspirators, dismissals prior to giving

6    the plaintiff ample opportunity for discovery should be granted very sparingly."

7    (Murrow Furniture Galleries, Inc. v. Thomasville Furniture Ind., Inc., 889 F.2d 524,

8
     529 (4th Cir. 1989))  Though Murrow involved anti-trust, proof of what Regan Carroll
9
10   seeks to redress is also largely in the hands of Defendants.

11        B.    Proposed Amendment

12             Carroll proposes to add the following allegations:

13             The Dogpatch Historic District was initiated by DNA; it was not a City-
14
     initiated district.  DNA paid for the report which was used to create the odd-shaped,
15
16   non-contiguous district for the purpose of enabling DNA members to prevent

17   construction to which they objected but which could not be opposed on any existing

18   grounds.  DNA did not follow the U.S. Secretary of Interior's standards in the

19
     creation of the district.  Carroll's property is an empty lot and is surrounded by
20
21   several other parcels which are considered non-historic, yet they are included in the

22   district.  On the other hand, properties on the other side of the same street are not

23

24   _____
     [1] Given the notice pleading standard clarified by Leatherman v. Tarrant County
25   Narcotics Intelligence and Coordination Unit, 507 U.S. 163 (1993) and Crawford-El v.
     Britton, 523 U.S. 574 (1998), it is probable that a motion to dismiss is inappropriate
26   for a claim of this type unless the pleading is wholly conjectural and vague.  The City
     relies on numerous cases, e.g., Chongris v. Board of Appeals, 811 F.2d 36 (1st Cir.
27   1987), which do not appear to have survived this jurisprudence.  (See Feliciano v.
     DuBois, 846 F.Supp. 1033, 1042 (D.Mass. 1994) citing Chongris, et al.)
28

included. DNA intentionally had Carroll's property included in the district so that it could thwart his development of it at the behest of various powerful individuals, including the City Attorney, who lives across the street, and members of DNA.

In 1999, at a meeting with members of the predecessor of DNA (Lower Potrero Hill Neighborhood Association ("LPHNA")) after Carroll and his elderly mother had obtained a demolition permit for the original building, group members objected and wanted to keep the structure, which was dilapidated and not economically feasible to repair. When Carroll politely stated that retention was not practical, and indicated that he was willing to stand up to them to support his rights, he was essentially told that he was outnumbered and that they could force him to do what they wished. The group then told Carroll that they were undertaking a process to create "a historic designation" for the Dogpatch area and would use that designation to force the structure to be preserved.

At one point, members of DNA protested Carroll's demolition permit but did not challenge his construction permit. After he won the demolition permit challenge, DNA sought rehearing, claiming that they were unaware of the need to challenge both permits. Carroll pointed out that a few year earlier, some of the same people had protested *both* his demolition and construction permits at another, unrelated, project. In other words, Carroll showed DNA up as liars. Furthermore, in 2001 or 2002, DNA attempted to get a neighborhood dog destroyed. Carroll helped the family who owned the dog to file a writ petition to overturn the order. Dennis Herrera, now San Francisco's City Attorney, personally called Carroll with a profanity-laden tirade. Herrera lives across the street from the property and has an

actual interest in thwarting the construction, both due to his long-standing personal animus against Carroll and due to the fact of the project.

Over time, members of DNA became even more politically connected, with the ability to demand department action by e-mail. This influence extended to being able to have planner Corrette, who assisted DNA in the designation process, remove the permit. In fact, Lawrence Badiner was aware of the DNA's desire to snatch the permit and actually approved Corrette's action. Corrette had also instigated actions at the behest of DNA that led to a wrongfully-issued "Stop Work Order" which shut Carroll down after he had spent more than $30,000 excavating the foundation pursuant to a properly-issued excavation permit. Ironically, the concessions DNA wanted on the project were the same concessions that the City wanted in order to reinstate the permit.

Furthermore, property owners who accede to DNA's demands, whether regarding the scope of their project or for payments to various funds, are given approval. However, Carroll, who insisted on standing on his rights and not caving in to design and monetary pressure, had his permit revoked by order of DNA. Indeed, there was no determination that his project would not pass any objective criteria related to Dogpatch as a historic neighborhood.

III.    CARROLL CAN STATE A CLAIM UNDER 42 USC 1983

    A.    Substantive Due Process

        1.    Targeted Governmental Conduct Can Rise To A Constitutional Level

        Contrary to Defendants' arguments, substantive due process does

1  protect persons, including property owners, from targeted government animus,

2  provided that the level of animus is high enough.

3

4          [A]n individual also may state a claim under the Equal
           Protection Clause if he can show that state government took
5          an action that "was a spiteful effort to 'get' him for reasons
           wholly unrelated to any legitimate state objective." The
6          Equal Protection Clause provides a remedy when a
           "powerful public official pick[s] on a person out of sheer
7          vindictiveness." This type of discrimination has been
           characterized as the creation of a "class of one." (Albiero v.
8          City of Kankakee, 246 F.3d 927, 932 (7th Cir. 2001), citations
9          omitted)

10         There is also no question that San Francisco has allowed at least one

11 neighborhood group to control local development and be able to severely injure those

12
   the group disfavor. (Schulz v. Milne, 849 F.Supp. 708 (N.D. Cal. 1994)) In Collier v.
13
14 Town of Harvard, Civ.A.95-11652-DPW (1997 WL 33781338 (D.Mass. 1997), the

15 District Court denied a similar motion to dismiss brought by a property owner who

16 alleged that in order to obtain a development permit, he was being shaken down by
17
   local officials. (Collier, supra, at *1-*3) Collier rejected the analysis presented by
18
19 Chongris, on which Defendants here rely, and used such cases as Chiplin

20 Enterprises, Inc., v. City of Lebanon, 712 F.2d 1524 (1st Cir. 1983) and Creative

21 Environments, Inc. v. Estabrook, 680 F.2d 822 (1st Cir.) to support *plaintiff.*[2]
22
   Regarding Chongris, the Court stated: "That form of analysis is inapplicable to the
23
24 current claim which does not involve procedural due process, but rather implicates

25 the substantive due process right to be free from governmental coercion." (Collier,

26

27 _____

28 [2]Even Chongris recognized that official behavior can be sufficiently egregious to
   "work a breach of the due process clause." (Chongris, supra, 811 F.2d at 43)

supra, at *4) <u>Collier</u> then cited numerous cases holding that government conduct that reaches a truly horrible level of animus against a person does violate due process. The Court found that "plaintiffs' allegations here are far more fundamental than a dispute over interpretation; they touch on corruption of the process." (<u>Collier</u>, supra, at *7)

For instance, <u>Chiplin</u>, which Defendants give great weight, itself stated: "[t]o be sure, additional factors might give rise to genuine constitutional issues in cases of this sort." (<u>Chiplin</u>, supra, 712 F.2d at 1527) It also quoted, approvingly, <u>Creative Environments</u> which stated that even a "conventional planning dispute" can implicate the Constitution if "tainted with fundamental procedural irregularity. . . ." (<u>Chiplin</u>, supra, 712 F.2d at 1528) Oddly enough, <u>Chiplin</u> stated:

> We hesitate to say that on the face of the complaint the district court lacked jurisdiction. Chiplin's right to recover depends on construction of the Constitution and laws of the United States, and its claim is not so patently frivolous as not to involve a federal controversy. (<u>Chiplin</u>, supra, 712 F.2d at 1528)

Deep-seated animosity can support an equal protection claim. (<u>Bell v. Duperrault</u>, 367 F.3d 703, 709 (7th Cir. 2004)) "Such animosity occurs when 'a powerful public official pick[s] on a person out of sheer vindictiveness,' or when an official acts 'for the sole and exclusive purpose of exacting retaliation and vengeance against' the plaintiff." (<u>Id.</u>) <u>PFZ Properties, Inc. v. Rodriguez</u>, 928 F.2d 28 (1st Cir. 1991), on which the City relies, states:

> "[S]ubstantive due process prevents 'governmental power from being used for purposes of oppression,' or 'abuse of government power that shocks the conscience,' or 'action that is legally irrational in that it is not sufficiently keyed to

1         any legitimate state interests.'" (<u>Id</u>. at 31-32, citations
2         omitted)

3   Thus, while routine, or even heightened irregularities, corruption, or incompetence

4   do not make a federal case, "[a] different situation may be presented in some

5   instances, particularly in the realm of equal protection, involving gross abuse of

6
7   power, invidious discrimination, or fundamentally unfair procedures." (<u>Creative</u>

8   <u>Environments</u>, supra, 680 F.2d at 832) Accordingly, this Court can only grant the

9   City's motion if the proposed second amended complaint is conceded to be true but

10  yet does not shock the conscience or single Carroll out for wrongful treatment

11
12  without rational basis. If the Court reaches that conclusion, it is basically telling San

13  Francisco that nothing it does to harm property owners, whether directly or as the

14  agent of private persons, can ever violate the U.S. Constitution.

15        As evident in its discussion at 9:5-10:21, the City seeks to mislead that

16  Court as to the gravamen of Carroll's complaint. Contrary to the City's discussion, he

17
18  does not complain that Planning, either negligently or intentionally, denied his

19  permit application. Indeed, it approved it and had it ready for issuance/pickup.

20  Accordingly, none of its cases are relevant because he is not challenging a land use

21  decision. Rather, he challenges a delegation of power decision. He challenges

22
23  Planning's decision to delegate de facto authority over permit issuance to his

24  neighbors. When DNA ultimately had a change of heart, the City violated Carroll's

25  federal civil rights by acting on the power it had improperly ceded to the group.

26  There is no administrative process that can put a stop to such wrongful conduct.

27  That was demonstrated by <u>Schulz</u>. Indeed, because it ignores Carroll's allegations
28

regarding the fate of his permit, the City cannot point to any state or local remedies, administrative or judicial, that would redress this violation.

The City's treatment of <u>Schulz</u> is erroneous. First, the City argues that there was no formal delegation of power. (MPA at 11:10-11) Neither <u>Schulz</u> nor any of its progeny require that there be a formal delegation. Indeed, that would mean that to avoid a constitutional violation, the delegation should be sub rosa. That would exacerbate violations. Second, in arguing that the pleading is defective, the City states that Carroll "*suggests*" that "'Planning refused to determine whether the Application was complete unless DNA approved it.'" (MPA at 11:14-15, emphasis added, *quoting*, First Amended Complaint, ¶ 6) This is erroneous – Carroll does not *suggest* it, he clearly and plainly says it: "Planning refused to determine whether the Application was complete unless DNA approved it." Further on, the City blithely, and without any support, claims that DNA "*did not express any views* as to the Application at all after June of 2001." (MPA at 12:7-9, italics in original) This is contradicted by ¶¶ 10, 11, which the Court must accept as true, which allege that Corrette removed the permit "after being contacted by a member of DNA" (¶ 10 at 13-15) and that Corrette played an inside role in the designation of Dogpatch as historic (¶ 11).

Then, in contravention of FRCP 8(a), which only requires "a short and plain statement of the claim showing that the pleader is entitled to relief," the City states that Carroll does not allege when he submitted the application to the City. (MPA at 11:17-18) While that fact may be useful or even necessary to submit to a jury in order to understand the history of the case, it is not necessary in order to state a

claim. (Empress LLC v. City and County of San Francisco, 419 F.3d 1052, 1055-1056 (9th Cir. 2005))

2.    Government Conduct That Deprives Carroll Of A Permit To Which He Is Entitled Violates Substantive Due Process

The standard in the 9th Circuit is Bateson v. Geisse, 857 F.2d 1300 (9th Cir. 1988). The 9th Circuit held that after Bateson had satisfied all permit requirements, the city's refusal to issue it constituted a violation of substantive due process. (Id. at 1303) Here, Carroll did satisfy all the permit requirements. The City's reliance on the Certificate of Appropriateness is erroneous in this regard because under the California Permit Streamlining Act ("PSA"), because the City did not process his application timely, it lost the ability to impose new requirements.[3]

"The PSA was enacted in part to expedite decisions on development projects." (Findleton v. Board of Supervisors, 12 Cal.App.4th 709, 713 (1993), citing Gov't Code § 65921) It was adopted to relieve permit applicants from protracted and unjustified governmental delays in processing their applications. (Bickel v. City of Piedmont,16 Cal.4th 1040, 1049 (1997)) The PSA requires the agency to notify the applicant when and why an application is "incomplete" and also when it is "complete." (Gov't Code § 65943) Under the PSA, the City is required to compile one or more lists specifying in detail the information required for review and approval of an application for a development project, and to make such lists available to all applicants and to anyone else who requests them. (Gov't Code § 65940) Under

---

[3] In his second amended complaint, Carroll will allege the facts necessary to show that he did qualify under the PSA and CEQA (California Environmental Quality Act).

the PSA, once the agency accepts the application as complete, it cannot require any further information except to the extent set forth in Government Code § 65944. Section 65944 allows the agency to "in the course of processing the application, request the applicant to clarify, amplify, correct, or otherwise supplement the information required for the application."

Separately, every project is classified in one of three categories: 1) categorical exemption/general rule exclusion; 2) negative declaration ("Neg. Dec."); or 3) environmental impact report. (Gov't Code §§ 65950-65952) Pursuant to Government Code §§ 65941 and 69550(a)(3), the agency may take steps to comply with CEQA. If a Neg. Dec. is prepared, the appropriate agency (here, the Planning Department) then has 180 days from the date the application is deemed complete to finish the Neg. Dec. (Public Resources Code § 21151.5(a); Guidelines § 15107)[4] The PSA sets time limits on processing development permit applications after an application is determined to be, or deemed, complete. When a project is found to be exempt from CEQA or a Neg. Dec. is adopted for a project, the agency shall approve or deny the project within 60 days from the date of the determination or adoption. (Gov't Code § 65950; Public Resources Code § 21151.5) Once the application is complete and a Neg. Dec. is issued, the agency *must* approve or disapprove the development application within sixty days thereafter. (Gov't Code § 65950(a)(3)) If not, the applicant may utilize the "deemed approved by operation of law" provisions. (Gov't Code § 65956)

---

[4] CEQA Guidelines are located at Title 14 of the California Code of Regulations and are referred to herein as "Guidelines."

1     Here, almost two years after the City deemed the application complete

2    and approved the Site Permit, the City designated the Dogpatch neighborhood in

3
     which the Property is located as a "historic district" by adopting Appendix L to
4
5    Article 10. The City's insistence that Carroll submit a COA violates PSA § 65944

6    because it requires information that was not specified in any list compiled by the City

7    pursuant to § 65940 *before* the City found the BPA complete. However, the City had

8
     already conducted an environmental review, *and* adopted and issued a Neg. Dec. on
9
10   July 28, 1999. In fact, CEQA expressly <u>forbids</u> a subsequent Environmental Impact

11   Report ("EIR") unless one or more of the following occurs:

12       a)    Substantial changes are proposed in the project which will require

13   major revisions of the environmental document;

14
         b)    Substantial changes occur with respect to the circumstances under
15
16   which the project is being undertaken due to the involvement of new significant

17   environmental effects which will require major revisions in the environmental

18   document; or

19
         c)    New information, which was not known and could not have been
20
21   known at the time the environmental documents was certified or adopted, becomes

22   available. (Pub. Res. Code § 21166 augmented by CEQA Guidelines § 15162) The

23   California Resources Agency has extended this rule to situations where the approved

24   environmental document is a negative declaration. (<u>Benton v. Board of Supervisors</u>,

25   226 Cal.App.3d 1467, 1478-1480 (1991), upholding Guideline § 15162(a))

26
         The designation of Dogpatch as a historic district is not a new
27
28   significant environmental effect requiring an updated negative declaration.

1  Dogpatch was designated a historic district, but there were no new significant

2  environmental effects as a result of that designation.  The previous Neg. Dec.

3  analyzed and evaluated Carroll's project in light of the historical significance of the

4  district even though it had not yet been "officially" designated.  Carroll will allege

5  that the Neg. Dec found that the project could not "disrupt or adversely affect a . . .

6  property of historic . . . significance."  In fact, this situation is very similar to

7  Chaparral Greens v. City of Chula Vista, 50 Cal.App.4th 1134 (1996) in which the

8  California Court of Appeal held that where changes in a project or its surrounding

9  circumstances occur subsequent to the adoption of a negative declaration, no

10  subsequent EIR shall be prepared unless the lead agency determines that there is a

11  substantial change in the project which would increase the severity of the previously

12  identified environmental effects.  (Id. at 1151 citing Guidelines § 15162)

13      The City's reliance on Land Waste Management v. Contra Costa

14  County Bd. of Supervisors, 222 Cal.App.3d 950 (1990) is inapposite because there, the

15  permit sought by appellant at the time of submittal was not consistent with

16  applicable land use and zoning, and required a variance.  Here, the City has failed to

17  show that Carroll's project was not "appropriate" for Dogpatch – at best all it can do

18  is show that it dragged its feet on the issue for years and as a result that

19  appropriateness is not document.  Of course, Carroll contends that the City did not

20  simply drag its feet but actively sabotaged his project.  However, the result is the

21  same – unlike cases where it was clear that the project did not qualify under

22  applicable substantive land use regulations, issuance of the permit will not, ipso

23  facto, allow a project that violates zoning regulations to proceed.  Accordingly, under

Bateson, Carroll can state a substantive due process claim.

    B.    Equal Protection

        If he has not sufficiently pled a class of one, Carroll's proposed complaint does so. No other Dogpatch-area applicant has been subject of a targeted campaign to thwart development. No other Dogpatch-area applicant has had its permit pulled back after hours by a City employee acting at the behest of a neighborhood group. Planning treated him differently from other people who's permits required only pick up because he had displeased DNA. There certainly was no rational basis for Corrette's conduct. If Carroll were not entitled to the permit, the City should have used the same administrative process it expects him to follow.

        There was no rational basis for treating Carroll differently. In arguing that he was not entitled to the permit, the City mistakes the substantive entitlement for the procedural classification. However, the injury is the denial of equal treatment not the ultimate inability to obtain the benefit. (Northeastern Florida Chapter of Assoc. Gen. Contractors of America v. City of Jacksonville, Fla. 508 U.S. 656, 666 (1993)) In other words, the focus is not on the rational basis for snatching the permit, but the rational basis for treating Carroll differently than other applicants who kowtow to DNA. The key case to consider is Genesis Environmental Services v. San Joaquin Valley Unified Air Pollution Control Dist., 113 Cal.App.4th 597 (2003), which discusses Olech. Genesis recognizes that an equal protection claim focuses on whether there is a rational basis for the difference in treatment between two similarly-situated persons. (Genesis, supra, 113 Cal.App.4th at 605) It then sets forth the elements of such a claim:

(1) plaintiff was treated differently from other similarly situated persons; (2) the difference in treatment was intentional; and (3) there was no rational basis for the difference in treatment. (<u>Genesis</u>, supra, 113 Cal.App.4th at 605)

<u>Genesis</u> then considered and *rejected* the City's exact argument:

the District contends "even if [Genesis] was singled out for strict enforcement of the Source Test Guidelines, [Genesis] cannot state a claim if there existed a rational basis for [Genesis's] disqualification from the independent contractor program." This contention also is contrary to the principles set forth in <u>Olech</u> . . . which establish that there must be a rational basis for the *difference in treatment* of those similarly situated. In other words, if a rational classification is applied unevenly, the reason for singling out a particular person must be rational and not the product of intentional and arbitrary discrimination. (<u>Genesis</u>, supra, 113 Cal.App.4th at 606, emphasis in orig.)

Furthermore, the City did not have a rational basis for its conduct, classification notwithstanding. Because it is an important substantive argument, Carroll initially addresses the City's key argument that, even though this is not an administrative challenge, Carroll must lose because he could not have been issued the permit that was snatched back. The City argues that building projects must comply with the Planning Code in effect at the time of permit issuance. (Memo at 8:24) <u>Wells Fargo Bank v. Town of Woodside</u>, 33 Cal.3d 379 (1983) is inapposite because it involved a specific Gov't Code prohibition on the subdivision of real property and requires a finding "that development of such real property is contrary to the public health or the public safety." (<u>Id</u>. at 385, fn.7) The issue involved was

whether a local subdivision ordinance which purports to require a surviving widow to obtain local approval of a division of land resulting from her application in the probate court to have a portion of a larger parcel of land set apart

from the estate for her as a probate homestead is "in conflict" with the state probate homestead law.  (Id. at 381)

Given that the City did not cite a specific section of the case, it is clear that it is not relevant.

Second, while it is true that "even after a permit has been issued, it may be revoked by an administrative body on the basis of a subsequent change in the zoning laws unless the permittee has made substantial improvements in good faith reliance on the permit," (Selby Realty Co. v. City of San Buenaventura, 10 Cal.3d 110, 125 (1973)) the proper administrative body did not revoke the permit – a snatch-and-grab in the middle of the night – hardly qualifies.  However, Petitioner should be given leave to amend his petition to allege that he did make substantial improvements in good faith. . . .  (Id.)  More importantly, Selby Realty stated:

> The cases holding that an appellate court will apply the rule in existence at the time of deciding the appeal appear to be inconsistent with another line of authority holding that if an applicant complies with all the requirements for a building permit at the time the application is made he is entitled to a permit even though the law has been changed prior to the decision on appeal.  These two apparently conflicting lines of cases have been distinguished on the ground that the change in the ordinance is deemed inapplicable if its enactment stemmed from an attempt to frustrate a particular developer's plans.  (Russian Hill Improvement Ass'n. v. Board of Permit Appeals, 66 Cal.2d 34, 37 fn. 5 (1967))

As explained above, Regan Carroll will allege that his property was targeted by the district.

Furthermore, Appendix L – with which the City contends Petitioner did not comply because he did not obtain a certificate of appropriateness – is *not* a zoning ordinance.  Zoning laws regulate the geographic allocation and permissible

uses of land; they represent a considered, specific, and lasting implementation of the broad statements of policy of the general plan.  (<u>United Outdoor Advertising Co. v. Business, Transportation & Housing Agency</u>, 44 Cal.3d 242, 249 (1988))  Under Planning Code § 1006, the appropriateness requirement is not a zoning or land use law, but simply regulates aesthetics.  Indeed, the section excludes interior alterations.  (<u>Martin v. City and County of San Francisco</u>, 135 Cal.App.4th 392, 406 (2005))  Certainly zoning laws regulate the interior of proposed structures, not just the facades.

More importantly, the City overlooks and misreads the very code section on which it relies.  The City states that building permits must be "*in conformity with* the Planning Code. . . ."  (MPA at 2:23, emphasis added)  It also argues that Carroll did not apply for or receive a Certificate of Appropriateness.  (MPA at 6:17-19)  The pertinent language of Appendix L states:

> If such certificate is required and has not been issued, the permit application shall be . . . held by the Department until such time as conformity does exist. . . .

This is important because it establishes that what matters is not a piece of paper (the certificate), but the merits – where conformity actually exists.  In other words, had the permit not been stolen, and had it been issued to Carroll, then in order to revoke it, the *City* would have had the burden to establish that conformity did not exist.  This is because under the pertinent section, the Department can process and approve the application as long as there is conformity with whatever is considered to be appropriate for the neighborhood.  However, it is not proper for the City to comply with DNA's instruction to take the permit so that it cannot be issued.

Through unconstitutional conduct, the City engaged in do-it-yourself burden shifting in violation of Carroll's civil rights.

Ironically, the City admits that on December 2, 2005, that Article 10 review had to be done (MPA at 6:22-23) yet more than two years later nothing has been done. It is an utter mystery why the Planning Department of the City of San Francisco, one of the greatest cities on Earth, cannot determine whether a building project is appropriate for a neighborhood that is only several square blocks. Perhaps it would have been done had Planning not been retaliating against Carroll, by losing his submissions as he will also allege – whether at its own instigation or at the direction of DNA. The City simply does not have a rational basis to authorize private citizens to command employees to remove ready-to-be-issued permits.

C.    Carroll's Claims Are Not Time-Barred

The final act that harmed Carroll was the snatching of the permit by a government official at the command of a DNA member. In contrast, the City chooses to consider that it was DNA's approval in 2001. (MPA at 16:15-18) However, the City's decision to pick and choose when it would like the statute to have run does not make it so.

D.    Neither Res Judicata Nor Collateral Estoppel Apply

The City's boilerplate argument is utterly inapposite. Contrary to the City's characterization, Carroll is not challenging a City administrative decision.[5]

---

[6] The City states that "unless a party to a quasi-judicial proceeding challenges the agency's adverse findings made in that proceeding. . . ." Calling Corrette's action a quasi-judicial proceeding is like calling Watergate a quasi-executive proceeding; it wasn't – it was burglary.

1   Had it denied or revoked his permit in the usual and proper course, by giving him

2   regular due process – notice and a basis for its action – he would simply file a state

3   court writ of administrative mandate.  However, such a claim cannot redress the

4   denial of his civil rights in the manner that occurred here.  Even if he gets his permit

5   through such a proceeding, the harm he has suffered, and the City's ability to

6   continue violating his and others' civil rights, will continue unabated.  There cannot

7   be any preclusive effect from a non-occurrence.  (Castillo v. City of Los Angeles, 92

8
9   Cal.App.4th 477, 481 (2001), discussing elements of collateral estoppel)  Briggs v. City

10  of Rolling Hills Estates, 40 Cal.App.4th 637 (1995) does not assist the City.  It held

11  that collateral estoppel gave the agency's factfinding preclusive effect.  (Briggs,

12
13  supra, 40 Cal.App.4th at 645-648)  What factfinding has there been here?

14          The City makes two other, related, throw-away arguments:  1) failure to

15
16  exhaust state judicial remedies; and 2) 90-day statute of limitations.  (MPA at 18:25-

17  19:7)  Neither of these applies because this is purely a civil rights action.  A civil

18  rights plaintiff has no obligation to exhaust administrative remedies.  (Patsy v. Board

19
20  of Regents, 457 U.S. 496, 515 (1982))  While there may be collateral estoppel problems

21  from the failure to do so, that is not an issue here, as explained above.  As for

22  Government Code § 65009, it is inapplicable which the City recognizes earlier in

23  discussing the applicable statute of limitations.  (MPA at 16:19-20; see also Jackson v.

24  Cedars-Sinai Medical Center, 220 Cal.App.3d 1315, 1323 (1990), recognizing federal

25
26  rule in California)  Even if Carroll's civil rights claims were directed to an

27  adjudicatory decision, California could not force him to bring a § 1983 claim within

28  90 days.

E.    Carroll's Claims Are Not Unripe

The same reason Carroll's claims are not time-barred, or barred by any preclusive doctrine, applies to the City's unripeness claim: he is not challenging an adjudicatory decision. His civil rights have already been harmed and he *is* entitled to compensation. Hoehne v. County of San Benito, 870 F.2d 529, 532 (9th Cir. 1989) is inapposite because it involved a challenge to a decision made on the merits. There simply wasn't one here. Hoehne is where the term "Grand Mufti" comes from. (Id.) Carroll is not asking this Court to be the Grand Mufti and review a merits decision, but instead, he asks that this Court simply be a Court and exercise its paramount role in protecting his federal civil rights. (Roach v. Morse, 440 F.3d 53, 56 (2nd. Cir. 2006), citing Patsy v. Bd. of Regents, 457 U.S. 496, 516 (1982))

The rest of the City's argument here is absurd. In discussing the rationale of ripeness, it cites U.S. Supreme Court law stating that the doctrine prevents courts "from entangling themselves in abstract disagreements over administrative policies. . . ." (MPA at 21:12-15) A lawsuit over delegating power to a neighborhood group in a manner that lets that group then command employees to snatch permits after hours is an abstract disagreement over administrative policy? If DNA commanded the permit snatching because it didn't want some "different type of person" to build, that would be an abstract disagreement over administrative policy? No, it would be the Justice Department running San Francisco's Planning Department. The moment Corrette took that permit from the issuance box, Carroll's claims were ripe.

1    IV.    CARROLL SHOULD BE GIVEN LEAVE TO FILE A SUPPLEMENTAL
2           COMPLAINT

3                While, in part, count three could be considered supplemental, Carroll

4    should be given, or allowed to seek, leave to:  1) allege subsequent facts that go to

5    motive, intent, etc., that do not create a new cause of action but support federal

6    jurisdiction for his first two counts; and 2) add a supplemental cause of action for

7    post-filing misconduct.  The City is absolutely incorrect that a supplemental claim
8
9    cannot be a new cause of action.  (MPA at 22:15-19)  The City relies primarily on

10   Planned Parenthood of Southern Arizona v. Neely, 130 F.3d 400 (9th Cir. 1997).[6]  The

11   supplemental pleading in Neely was not simply a new cause of action, but a

12   challenge to an entirely different state statute brought four years after final judgment.
13
14   (Neely, supra, 130 F.3d at 402)  It was obviously an exercise in forum shopping.  In

15   contrast, Cabrera v. City of Huntington Park, 159 F.3d 374, 382 (9th. Cir. 1998) states:

16                   Rule 15(d) permits the filing of a supplemental pleading
                     which introduces a cause of action not alleged in the original
17                   complaint and not in existence when the original complaint
                     was filed."    Although Cabrera never filed a formal
18                   "supplemental pleading," the erroneous characterization of
                     the corrected pleading as a "second amended complaint" as
19                   opposed to a supplemental pleading is immaterial.  "This
                     interpretation of Rule 15(d) is supported by the general
20                   purpose of the Rules to minimize technical obstacles to a
21                   determination of the controversy on its merits."  (Cit. om.)
22
23   Furthermore, in discussing Neely, Cabrera noted that its holding was limited to "a

24   'separate, distinct and new cause of action' where the original action between the

25   parties has reached a final resolution and the district court does not retain

26   _____

27   [7]Matsushita Elec. Co. Ltd. v. CMC Magnetics, 2007 WL 127996 (N.D. Cal., 2007)
     simply relies on Neely.
28

Opposition to Defendant's Motion to Dismiss

jurisdiction." (Cabrera, supra, 159 F.3d at 382, fn. 11)

## V.    CONCLUSION

Regan Carroll recognizes the uphill battle he faces in fighting the deprivations of his rights to due process and equal protection. However, there are times when even in the land use context, a government's actions to thwart a small developer are so egregious that they do rise to a Constitutional level. This is one of those. To the extent that Carroll's pleading needs to be expanded up, he should be given the opportunity to do so. Otherwise, the motion should be denied.

Date: February 4, 2008                      ZACKS UTRECHT & LEADBETTER, P.C.


By:    James B. Kraus
       Attorneys for Plaintiff

---