1   DENNIS J. HERRERA, State Bar #139669
    City Attorney
2   KRISTEN A. JENSEN, State Bar #130196
    THOMAS S. LAKRITZ, State Bar #161234
3   Deputy City Attorneys
    City Hall, Room 234
4   1 Dr. Carlton B. Goodlett Place
    San Francisco, California 94102
5   Telephone:    (415) 554-4615
    Facsimile:    (415) 554-4757
6   E-Mail:       kristen.jensen@sfgov.org

7

    Attorneys for Defendant
8   CITY AND COUNTY OF SAN FRANCISCO
    (Including SAN FRANCISCO DEPARTMENT OF BUILDING
9   INSPECTION, SAN FRANCISCO BUILDING
    INSPECTION COMMISSION, and
10  SAN FRANCISCO PLANNING DEPARTMENT)

11

                    UNITED STATES DISTRICT COURT
12
                    NORTHERN DISTRICT OF CALIFORNIA
13
                         OAKLAND DIVISION
14

15  | REGAN CARROLL TRUST, Regan | Case No. C-07-2577 SBA |
    | Carroll, Trustee, | |
16  | | **CITY'S SUPPLEMENTAL REQUEST** |
    | Plaintiff, | **FOR JUDICIAL NOTICE IN** |
17  | | **SUPPORT OF MOTION TO DISMISS** |
    | vs. | **FIRST AMENDED COMPLAINT FOR** |
18  | | **LACK OF JURISDICTION AND** |
    | CITY AND COUNTY OF SAN | **FAILURE TO STATE A CLAIM, TO** |
19  | FRANCISCO, SAN FRANCISCO | **STRIKE THIRD COUNT OR, IN THE** |
    | DEPARTMENT OF BUILDING | **ALTERNATIVE, FOR SUMMARY** |
20  | INSPECTION, SAN FRANCISCO | **JUDGMENT** |
    | BUILDING INSPECTION | **[FRCP 12(B)(1); 12(B)(6); 12(F); 56]** |
21  | COMMISSION, and SAN FRANCISCO | |
    | PLANNING DEPARTMENT, | Hearing Date:   February 26, 2008 |
22  | | Time:           1:00 p.m. |
    | Defendants. | Place:          Courtroom 3, 3rd Floor |
23  | | |
    | | Trial Date:     TBA |
24

25

26

27

28

1    Defendant City and County of San Francisco (sued herein as the City and County of San

2  Francisco, San Francisco Department of Building Inspection, San Francisco Building Inspection

3  Commission, and San Francisco Planning Department; collectively "City"), by and through its

4  counsel of record, hereby requests that this Court take judicial notice pursuant to Federal Rule of

5  Evidence 201 of the following facts and documents:

6    1.    On December 5, 2007, the San Francisco Superior Court heard oral argument in

7  Superior Court Case No. CPF-06-506816. Thereafter, on January 3, 2008, the court issued its Order

8  Denying Petition For Writ Of Mandate Pursuant To C.C.P. §1085. A True and correct copy of that

9  order is attached as Exhibit 1 hereto.

10 Dated: February 12, 2007

11                                 DENNIS J. HERRERA
12                                 City Attorney
                                   KRISTEN A. JENSEN
13                                 THOMAS S. LAKRITZ
                                   Deputy City Attorneys
14

15
                              By: _____
16                                 KRISTEN A. JENSEN
17
                                   Attorneys for Defendant
18                                 CITY AND COUNTY OF SAN FRANCISCO

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1



DEC 12 2007

RECEIVED DEC 12 2007

1  DENNIS J. HERRERA, State Bar #139669
   City Attorney
2  KRISTEN A. JENSEN, State Bar #130196
   THOMAS S. LAKRITZ, State Bar #161234
3  CHRISTINE VAN AKEN, State Bar #241755
   Deputy City Attorneys
4  City Hall, Room 234
   1 Dr. Carlton B. Goodlett Place
5  San Francisco, California 94102
   Telephone:    (415) 554-4615
6  Facsimile:    (415) 554-4757
   E-Mail:       kristen.jensen@sfgov.org
7
8  Attorneys for Respondent and Defendant
   CITY AND COUNTY OF SAN FRANCISCO
9

FILED
San Francisco County Superior Court

JAN 3 2008

GORDON PARK-LI, Clerk
BY: _____
              Deputy Clerk

10          SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                  COUNTY OF SAN FRANCISCO

12                    UNLIMITED JURISDICTION

13  TRUST OF REGAN CARROLL,              Case No. CPF-06-506816
    REGAN CARROLL, TRUSTEE,
14                                       [PROPOSED] ORDER DENYING
                                         PETITION FOR WRIT OF MANDATE
15        Petitioners and Plaintiffs,    PURSUANT TO C.C.P. §1085

16        vs.

17  CITY AND COUNTY OF SAN
    FRANCISCO; CITY AND COUNTY OF        Dept: 302
18  SAN FRANCISCO DEPARTMENT OF          Honorable Patrick J. Mahoney
    BUILDING INSPECTION, AND CITY
19  AND COUNTY OF SAN FRANCISCO          ·Date Action Filed:  November 27, 2006
    PLANNING DEPARTMENT,
20                                       Consolidated for Trial with:
          Respondents and Defendants.    SF Superior Case No. 07-463565
21

22  REGAN CARROLL TRUST, et al.,
          Petitioners and Plaintiffs,
23
          vs.
24
    CITY AND COUNTY OF SAN
25  FRANCISCO, et al.,

26        Respondents and Defendants.

27

28

1    The hearing on the Petition for Writ of Mandate Pursuant to C.C.P. §1085 seeking an order

2    compelling the City to issue a permit for Petitioner's proposed project at 1169-79 Tennessee Street

3    ("Project") came on for hearing on December 5, 2007, at 9:30 a.m. in Department 302 of the above-

4    captioned court, the Honorable Patrick J. Mahoney, presiding. Petitioner Trust of Regan Carroll

5    appeared through its counsel of record, Andrew Zacks. Respondent and Defendant City and County

6    of San Francisco, sued in Case No. CPF-06-506816 as the City and County of San Francisco, City

7    and County of San Francisco Department of Building Inspection and San Francisco Planning

8    Department (collectively, "City") appeared through its attorney of record, Kristen A. Jensen.

9        Having read and considered the moving and opposition papers and the arguments of

10    counsel, the Court determines that Petitioner has not demonstrated that good cause exists to grant

11    the petition.

12        It is therefore ORDERED, ADJUDGED, AND DECREED that the petition for writ of

13    mandate is DENIED.

14        Petitioner makes essentially two arguments in support of this petition. First, Petitioner

15    argues that his building permit application was "complete" as of June 2001 and, because a Negative

16    Declaration had previously been adopted for the proposed project, his permit was "deemed

17    approved" pursuant to the Permit Streamlining Act ("PSA") once the notice provisions of

18    Government Code §65950 had been met. He then argues that the City violated the PSA by

19    requiring him to submit a Certificate of Appropriateness and updated environmental review because

20    these requirements were not reflected in any list provided to him before his Application was

21    considered "complete." [*Id.* at 13:4-9.] Both of these arguments miss the mark.

22

23    I.    FACTUAL BACKGROUND

24        A.    Petitioner's Proposed Project

25        The site of the proposed Project in this case is 1179-89 Tennessee Street (the "Property")

26    located in the Dogpatch Historic District of the City. Petitioner's predecessor in interest on the

27    Property filed an application to construct a four-story residential and commercial Project on the site

28    in 1999. On or about March 31, 2000, Petitioner acquired title to the Property and the pending

1

1   Application by assignment.  He then pursued project approvals sporadically, as his personal

2   circumstances permitted.  ~~Because he expected challenges to his proposed Project~~ Petitioner

3   ~~elected to have his building permit application processed as a Site Permit, as permitted by San~~

4   Francisco Building Code §106.3.4.2.  That process contemplates that a project sponsor will submit a

5   series of addenda for approval prior to final permit issuance.

6          After he acquired the Property in 2000, Petitioner re-designed the proposed building.  In

7   June 2001, the City sent Petitioner a letter stating that Petitioner's "application is being held because

8   the following information is required before it is accepted as complete . . . Time limits for review on

9   your project will not commence until we receive the requested information or materials and verify

10  their accuracy." The letter also requests that Petitioner "post the enclosed 11"x17" Poster when you

11  have received the official 30-day notice of Building Permit Application . . . ."

12         Between June 26, 2001, and November of 2005, the City requested, and Petitioner provided,

13  various information in connection with the City's review and approval of various "Technical

14  Addenda" to the Site Permit relating to mechanical, structural and other matters specified by the San

15  Francisco Building Code.  Petitioner concedes that the City's requests for such information were

16  "consistent with Gov[ernment] Code §65944."  In June of 2005, and again on or about November

17  14, 2005, the City approved various Technical Addenda for the application.

18         On November 14, 2005, the City notified Petitioner that his permit was ready for issuance

19  upon proof of payment to the San Francisco Unified School District of a school facilities fee.

20  Thereafter, Petitioner paid the school facilities fee and requested that his building permit be issued.

21  However, before the City issued the permit, the City's Planning Department staff became aware that

22  the Project had not been subjected to review for consistency with the requirements of the Dogpatch

23  Historic District (Article 10 of the San Francisco Planning Code) pursuant to amendments to the

24  Planning Code that took effect after Petitioner filed his project application.  Petitioner was informed

25  that the Planning Department had reasserted jurisdiction over the Application, and thus the permit

26  would not issue.

27         The City then notified Petitioner that, under Article 10 of the San Francisco Planning Code,

28  a "Certificate of Appropriateness is required for any new construction . . . of a structure for which a

2

OPP. TO PET'N FOR WRIT OF MANDATE.  CASE NO. 06-506816          n:\land\li2007\070790\00454604.doc

1  City permit is required, in an historic district" and requested that Petitioner "complete the attached

2  Certificate of Appropriateness Application."  In addition, the City notified Petitioner that his Project

3  was subject to additional environmental review under the California Environmental Quality Act

4  (Pulic Resources Code §§ 21000 *et seq.*)("CEQA") as a result of the designation of the project

5  neighborhood as an historic district.  Such designation requires that the Project be reviewed under

6  the Secretary of the Interior's Standards for the Treatment of Historic Properties, as well as the

7  accepted criteria for CEQA review regarding mitigation of "adverse impacts" to "historic

8  resources."

9        Petitioner did not apply for  the required Certificate of Appropriateness ("COA"), or provide

10 updated environmental review pursuant to CEQA.  Instead, he filed this and several other legal

11 actions to avoid these legal requirements.

12 **B.**    **Amendment Of The Planning Code**

13       In 2003, while Petitioner's permit application was pending, the Board of Supervisors

14 adopted legislation creating the Dogpatch Historic District and requiring review of all projects

15 proposed in the District for consistency with Appendix L (Dogpatch Historic District) to Article 10

16 (Preservation of Historical Architectural and Aesthetic Landmarks) of the Planning Code

17 ("Appendix L").  Article 10 requires, among other things, that

18           (a)  No person shall carry out or cause to be carried out on a designated
             landmark site or in a designated historic district any construction ... for
19           which a City Permit is required, except in conformity with the provisions of
             this Article 10.  In addition, no such work shall take place unless all other
20           applicable laws and regulations have been complied with, and any required
             permit has been issued for said work.
21
             ....
22           (c)  The Central Permit Bureau shall not issue, and no other City department
             or agency shall issue, any permit for construction ... in an Historic District,
23           except in conformity with the provisions of this Article 10.  In addition, no
             such permit shall be issued unless all other applicable laws and regulations
24           have been complied with.
25           ....
             (e)  After receiving a permit application from the Central Permit Bureau in
26           accordance with the preceding subsection, the [Planning] Department shall
             ascertain whether Section 1006 requires a Certificate of Appropriateness for
27           the work proposed in such permit application. ... If such Certificate is
             required and has not been issued, or if in the sole judgment of the Department
28           the permit application does not conform, the permit application shall be

3

disapproved or held by the Department until such time as conformity does
exit; the decision and action of the Department shall be final.

(Planning Code §1005, subs. (a), (c), and (e)(emphasis added).)  Section 1006 of the Planning Code,

in turn, requires a COA in the case of "[a]ny construction … for which a City permit is required, …

in a historic district." (Planning Code §1006.)  Section 1006.2 provides that the Planning

Commission shall hold a public hearing on all applications for a COA.  (Planning Code §1006.2.)

Appendix L was effective as of April 18, 2003.

C.    The 1999 Negative Declaration

On August 10, 1999, the Planning Department adopted a Negative Declaration for the

Project pursuant to CEQA. The Cultural Impacts section of the Negative Declaration found no

impacts on historic resources.  However, the findings were expressly premised on the following

discussion:

> As stated earlier, there is local interest in gaining official status for Dogpatch
> as a historic resource, but it currently has no such designation.  Therefore
> requirements under Article 10 of the Planning Code do not apply, such as
> design review for compatibility with the "district."
>
> Given the lack of designated historic resources, and that the project would not
> demolish any structures, the project could not bee seen as having a substantial
> adverse effect on a historic resource.

The 1999 Negative Declaration has not been updated as required by CEQA to reflect the

historical district designation.  It is clear from the language set forth above that the findings in the

Negative Declaration relative to impacts on historic resources were specifically premised on the

lack of historic designation of the Dogpatch Neighborhood.  Since the adoption of the Negative

Declaration, substantial evidence regarding the historic resources present in the district has been

compiled and formed the basis for the Board of Supervisor's adoption of Appendix L to Article 10

of the Planning Code.  This evidence regarding changed circumstances could not have been

considered in the course of adoption of the 1999 Negative Declaration. (CEQA Guidelines §
15162(a), (b)).

## II.    STANDARD OF REVIEW

Judicial review of writ actions brought pursuant to Code of Civil Procedure section 1085 ("§1085") "is highly deferential." (*Citizens for Improved Sorrento Access, Inc. v. City of San Diego* (2004) 118 Cal.App.4th 808, 814; *see also Heist v. County of Colusa* (1984) 163 Cal.App.3d 841, 845 - 848.) "Under these standards, review is limited to an inquiry into whether the action was arbitrary, capricious or entirely lacking in evidentiary support." (*Citizens for Improved Sorrento Access, Inc. v. City of San Diego, supra,* 118 Cal.App.4th at p. 814 [quotation and citations omitted]; *Heist v. County of Colusa, supra,* 163 Cal.App.3d at p. 846.) The facts in this case do not establish that the City's actions were arbitrary, capricious, or lacking in evidentiary support. Instead, the record reflects that the City was legally bound to refuse issuance of Petitioner's building permit until such time as the proposed project complied with applicable law.

In a petition for writ of mandate brought pursuant to §1085, the petitioner bears the burden of pleading and proving the facts on which the claim for relief is based. (*California Correctional Peace Officers Association v. State Personnel Board* (1995) 10 Cal.4th 1133, 1153 - 1154.) Thus, the petitioner has the burden of proof to show that the decision is unreasonable or invalid as a matter of law. (*Citizens for Improved Sorrento Access, Inc. v. City of San Diego, supra,* 118 Cal.App.4th at p. 814.) In this case, Petitioner has failed to carry this burden.

## III.    ANALYSIS

### A.    The Permit Streamlining Act Does Not Entitle Petitioner to Issuance of an Illegal Permit

Although the PSA was enacted to expedite permit applications and clarify application requirements, nothing in it suggests that it was intended to protect a developer who waits to invoke its protection until after a law is passed with which he does not want to comply. "[A] permit, license or other governmental entitlement must conform to the law in existence at the time of its issuance or recordation rather than that in effect at the time of application or denial." (*Palmer v. Board of Supervisors* (1983) 145 Cal. App. 3d 779, 781.) By waiting to invoke the notice provisions of the PSA until after the Planning Code amendments were adopted, Petitioner waived his right to obtain deemed approved status under the Act.

5

1    The PSA cannot be interpreted to overcome the rule that "[l]ocal government agencies are

2    *powerless* to issue land-use permits which are inconsistent with governing legislation." (*Land Waste*

3    *Management Management v. Contra Costa County Bd. of Supervisors*(1990) 222 Cal. App. 3d 950,

4    959 (emphasis in original).) "'Government Code section 65950 ...was not meant to impose a

5    rigorous timetable on local government's exercise of its policy-making legislative function.'" (*Id.* at

6    957, fn. 2.) Moreover, "local government entities cannot issue land-use permits that are inconsistent

7    with controlling land-use legislation." (*Id.*) Petitioner admits the Property is in an historic district,

8    and that the Planning Code as it exists today requires that projects located in the district must obtain

9    a COA. (Planning Code § 1006.) Any permit issued in violation of the Planning Code, including

10   the provisions of Article 10 applicable to historic districts, is legally invalid. (S.F. Building Code §

11   106.4.3.) Because the permit in question requires a COA and updated CEQA review before it can

12   be lawfully issued, deemed approval under the PSA would violate both local law and CEQA. The

13   permit is therefore "inconsistent with governing legislation" and cannot be issued by operation of

14   law pursuant to the PSA.

15       A permit which is "deemed approved by operation of law" pursuant to the PSA is considered

16   issued as of the date it is deemed approved. (*Ciani v. San Diego Trust & Savings Bank* (1991) 233

17   Cal. App. 3d 1604, 1613-14.) That date, in turn, is 60 days after the notice requirements in

18   Government Code section 65956 have been met if the agency has failed to take action on the

19   application. (Gov't Code. § 65956.) Petitioner alleges that "[o]n or about August 9, 2006,

20   Petitioner complied with the PSA at Government Code § 65956(b) by providing the City with seven

21   days advance notice" and that "[o]n August 30, 2006, pursuant to the PSA at Government Code §

22   65956(b), Petitioner provided the City and the public with notice that the Project would be deemed

23   approved by operation of law if the City did not approve or disapprove" the Application within 60

24   days. Thus, he seeks deemed approved status as of October 29, 2006. However, Petitioner's

25   attempt to invoke the PSA was ineffective, because the City was prohibited from issuing the

26   requested permit unless and until Petitioner had complied with the requirements of Article 10.

27       In fact, Petitioner's arguments that the clock commenced for purposes of deemed approval

28   status under the PSA before April 2003 make no practical sense. By electing to have his

1    Application processed as a "Site Permit" pursuant to Building Code §106.3.4.2, Petitioner

2    committed to a process by which his final building permit could not be issued until all of the

3    required addenda had been processed. The Site Permit provisions of the Building Code specifically

4    provide that each addenda is treated as a separate "application," and that the holder of a site "permit

5    and addenda shall proceed with approved addenda work at the permittee's own risk, without

6    assurance that approvals for the remaining addenda or for the entire building or structure will be

7    granted." In this case, none of Petitioner's addenda were submitted to the City prior to adoption of

8    the relevant amendments to the Planning Code.

9        Petitioner in this case seeks a permit which is "inconsistent with controlling land-use

10    legislation" and which therefore cannot be issued. The Dogpatch ordinance requires a COA before

11    the permit can be issued, and the Building Code mandates that any permit issued in violation of the

12    Planning Code is legally invalid. Therefore, in order for Petitioner's permit to be legally issued

13    without first obtaining a COA, it would require a change in the controlling land-use legislation.

14    Petitioner's claim thus fails.

15        **B.    Government Code §65942 Permits the City to Seek New Information in
16              Response to a Change in Controlling Law**

17        The PSA expressly allows a lead agency to require applicants to provide additional

18    information and satisfy additional requirements in compliance with newly enacted ordinances.

19    (Gov't Code § 65942.) Where such new requirements are enacted during the pendency of a project

20    application, the application may be deemed "incomplete." The Act also provides an applicant with

21    the right to request notification of proposed changes to the law that would affect the project

22    application, a provision which would be meaningless if applications deemed "complete" were

23    thereafter shielded from changes in the law. (Gov't Code § 65945.) These provisions demonstrate

24    the Legislature's intent to perpetuate the mandate that local agencies comply with the law in effect

25    at the time of permit issuance.

26        Section 65942 expressly permits the City to determine that an application is not "complete"

27    for PSA purposes where new or revised local, state or federal requirements are adopted during the

28    pendency of the application. Specifically, that section provides:

Any revisions [of required information and criteria] shall apply prospectively only and shall not be a basis for determining that an application is not complete . . . if the application was received before the revision is effective except for revisions . . . [t]o comply with the enactment of new or revised federal, state, or local requirements, except for new or revised requirements of a local agency which is also the lead agency.

Under section 65929, a "lead agency" is defined as "the public agency which has the principal responsibility for carrying out or approving a project." Petitioner concedes that the Planning Department was the "lead agency" for project approval in this case. The amendments to Article 10 were not adopted by the Planning Department, but by the Board of Supervisors, the City's legislative body. As a result, the Planning Department did not violate the PSA when it required Petitioner to submit updated environmental review and a COA as required by the amended Planning Code.

C.    The 1999 Negative Declaration Did Not Address Designation of the Dogpatch Historic District

Whenever a further discretionary approval is required by the lead or a responsible agency under CEQA following adoption of a negative declaration or and Environmental Impact Report ("EIR"), the agency must determine whether updated CEQA review is required. Specifically, the CEQA Guidelines provide that "[w]hen an EIR has been certified or negative declaration adopted for a project, no subsequent EIR shall be prepared for that project *unless* the lead agency determines" that one or more of the following conditions exits: (1) substantial changes are proposed to the project which involve new significant environmental effects or a substantial increase in the severity of previously identified significant effects; (2) substantial changes have occurred with respect to the circumstances under which the project is undertaken involving significant environmental effects or a substantial increase in the severity of previously identified significant effects; or (3) new information is available which show one of four conditions relating to significant effects or mitigation measures. (14 Cal. Code Regs. §15162 (a).) "If changes to a project or its circumstances occur or new information becomes available after adoption of a negative declaration, the lead agency shall prepare a subsequent EIR if required under [§15162(a)]. Otherwise the lead

8

1  agency shall determine whether to prepare a subsequent negative declaration, [an] addendum, or no

2  further documentation." (*Id.* at §15162(b).)

3        In this case, the designation of the Dogpatch Neighborhood as an historic district is a

4  significant change in circumstances requiring updated environmental review. As the "lead agency",

5  only the Planning Department can determine what level of review is appropriate. (*Id.*) No such

6  review has been conducted since the Negative Declaration was initially adopted in 1999.

7        Contrary to the arguments of Petitioner's counsel, the language of the Negative Declaration

8  cited above does not reveal that the Planning Department considered the impacts of the proposed

9  project on a designated historic district. Rather, the opposite is true. The findings in the Negative

10  Declaration relating to historic resources are expressly conditioned on the lack of prior designation

11  of the Dogpatch Neighborhood as an historic district. Since that district was not designated until

12  four years after the initial Negative Declaration was adopted, Planning Department staff could not

13  have considered the project in the light of the information subsequently considered by the Board of

14  Supervisors in designating the district.

15

16

17        Until a permit is finally granted, all reviewing administrative agencies and courts must apply

18  the Planning Code in effect at the time of review. The California Supreme Court has long held that

19  "one who is not yet armed with a presently effective municipal license to proceed with construction

20  must assume the risk that, 'before final action [has] been taken on [his] application' [citation

21  omitted], the law might be changed so as to require that his application be denied." (*Russian Hill

22  Imp. Ass'n v. Board of Permit Appeals of City and County of San Francisco* (1967) 66 Cal.2d 34,

23  40.) Here, the City could not issue a permit until all addenda were approved, and Petitioner

24  complied with the Planning Code provisions relating to construction in an historic district. As a

25  consequence, Petitioner is not entitled to a "deemed approved" permit pursuant to the PSA.

26

27        The petition is DENIED.

28

OPP. TO PET'N FOR WRIT OF MANDATE,   CASE NO. 06-506816          n:\land\li2007\070790\00454604.doc

1    IT IS SO ORDERED.

2

3

4    Dated: _Jan 3_, 2008                     _Patrick J. Mahoney_

5                                             Honorable Patrick J. Mahoney

6                                             Judge of the Superior Court

7

8                                     _Trust of Regan Carroll_

9                                        _vs._

10                                     _CCSF    06-506816_

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

10